UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| FAY AVENUE PROPERTIES, LLC, LA JOLLA SPA MD, INC., | ) ) ) | Civil No.11-2389-GPC(WVG) |
| | ) | ORDER REGARDING JOINT STATEMENT FOR |
| Plaintiffs, | ) ) | DETERMINATION OF DISCOVERY DISPUTE |
| v. | ) ) | |
| TRAVELERS PROPERTY AND CASUALTY COMPANY OF AMERICA, | ) ) ) | |
| Defendant. | ) ) | |

I

INTRODUCTION

On December 2, 2013, the Court ordered that by December 6, 2013, Defendant produce documents and serve answers to interrogatories to which the parties agreed, and file a Joint Statement For Determination of Discovery Dispute ("Joint Statement") regarding interrogatories and Requests for Production of Documents to which the parties did not agree.

1

On December 6 and 9, 2013, the parties filed Joint Statements.[1/] The Joint Statements addressed whether Plaintiff was entitled to discover Defendant's reserves in this action, Defendant's standards and training manuals regarding the administration of claims, and Defendant's communications with its coverage counsel. A privilege log is attached to Plaintiff's (La Jolla Spa MD, Inc.'s) Joint Statement. (See Plaintiff's Index of Exhibits In Support of Joint Statement, filed 12/6/13, Exh. D, hereafter "December 6, 2013 Privilege Log").

Thereafter, the Court requested from Defendant supplemental briefing on the propriety of Plaintiff's requests to discover the communications noted above.

On February 3, 2014, Defendant filed a Supplemental Brief. A revised privilege log is attached to Defendant's Supplemental Brief. (See Declaration of Patricia A. Daza-Luu, Exh. 44, filed February 3, 2014, hereafter "February 3, 2014 Privilege Log."). On February 10, 2014, Plaintiff filed a Supplemental Brief.

The Court, having reviewed the Joint Statements, the Supplemental Briefing, the authorities cited therein, and the declarations and documents attached thereto, HEREBY GRANTS in part and DENIES in part Plaintiff's Application to compel Defendant's reserve information, DENIES Plaintiff's Application to compel production of Defendants' standards and training manuals regarding the administra-

---

[1/] Counsel informed the Court that disputes regarding interrogatories were resolved. (Joint Statement, December 6, 2013, Exh. A at 1).

2

tion of claims, and DENIES Defendant's Application to compel Defendant's communications with its coverage counsel.

## II

### REQUESTS FOR PRODUCTION OF DOCUMENTS

Plaintiff served on Defendant Requests for Production of Documents. Defendant served on Plaintiff objections to the Requests for Production of Documents. The objections address Defendant's redacted reserve information, Defendant's internal claims procedures and training information, and communications between Defendant and its coverage counsel contained in Defendant's claim file.

A. Reserve Information

Plaintiff seeks to compel the production of Defendant's reserve information as noted on the December 6, 2013 Privilege Log. Plaintiff identifies the following documents on the Privilege Log for which it seeks production: p. 86, nos. 1-5; p. 87, nos. 7, 9; pages 88-89, nos. 15, 16, p. 98 no. 51.

Plaintiff claims that it is entitled to discover Defendants' reserve information pertaining to its claim. Plaintiff asserts that reserve information is discoverable because it might be admissible at trial or in pretrial motions to assist Plaintiff in proving its theories that Defendant intentionally delayed payments to Plaintiff for which it knew Plaintiff was entitled, Defendant knew from the inception of the claim that its payments to Plaintiff were likely to be large, that Defendant made unjustified

demands for proof of loss and other documentation, and Defendants delayed payment to gain a settlement advantage. Plaintiff cites <u>Lipton v. Superior Court</u>, 48 Cal. App. 4th 1519, 1614-1615 (1996) and <u>Bernstein v. Travelers</u>, 447 F. Supp. 2d 1100 (N.D. Cal. 2006) to support its position.

Defendant argues that there are two different types of reserve information for the claim at issue in this case: **expense reserves** and **loss reserves**, and that neither is relevant to any claim or defense in this action. Therefore, it argues that the Court should not order Defendant to produce this information.

**Expense reserves** are the amount of the insurer's expected expenses likely to be incurred in the adjustment of claims, such as expert and consultant costs. <u>Lipton</u>, 48 Cal. App. 4th at 1613.

> **Loss reserves** represent the amount anticipated to be sufficient to pay all obligations for which the insurer may be responsible under the policy with respect to a particular claim. That amount necessarily includes expenses that are likely to be incurred in connection with the settlement or adjustment of the claim, as well as legal fees and other costs required to defend the insured. (These) estimates... are likely to be frequently adjusted during the course of the litigation.
> ... The main purpose of a loss reserve is... to reflect, as accurately as possible, the insured's *potential* liability.
> ... (I)n a case where the insurer has denied coverage and refused a defense, the *fact* that a reserve has been set by the insurer might well be relevant to show that the insurer must have had some knowledge that a potential for coverage existed....
> <u>Lipton</u>, 48 Cal. App. 4th at 1613-1614. (emphasis in original, citations omitted).

### 1. Expense Reserves

Defendant argues that its **expense reserves** are not relevant to any claim or defense in this action. Further, it argues that there is no authority that supports Plaintiff's argument that the amounts Defendant paid consultants and experts in adjustment of Plaintiff's claim are relevant to its alleged bad faith with respect to the handling of Plaintiff's claim. In fact, the contrary is true. The fact that Defendant paid consultants and experts with respect to Plaintiff's claim shows that Defendant made a good faith distinct effort to analyze and evaluate Plaintiff's claim. Moreover, Defendants have agreed to produce to Plaintiff correspondence by and with consultants used by the law firm hired by it to assist in administration of, and provide a coverage opinion regarding, Plaintiff's claim.[2]

The Court agrees with Defendant regarding discovery of its **expense reserves**. Plaintiff does not offer any authority, and the Court has not found any authority, to suggest that an insurer's **expense reserves** information is discoverable. Further, since Defendants produced the consultants' correspondence by and with Defendant's counsel in the administration of Plaintiff's claim, and the fact that Plaintiff's claim was denied due to its alleged failure to cooperate with Defendant and its alleged misrepresentations made to Defendant during the

---

[2] These consultants are Chris Money, Shannon Green, Robert Underwood, William Reid. Cynde Chaffin, Bob Jackson and Kate Humphries. (Declaration of Patricia A. Daza-Luu, filed February 3, 2014, at paras. 2-3)

claims administration process, the Court does not see how Defendant's **expense reserves** information, other than what Defendants have agreed to produce, would be relevant to any claim or defense in this bad faith action. As a result, the Court DENIES Plaintiff' Application to compel production of Defendant's **expense reserves** information.

2. <u>Loss Reserves</u>

As to Defendant's **loss reserves**, Defendant acknowledged that in liability cases, the fact that an insurer has established a **loss reserve** for an insured's claim may be relevant to show the insurer's awareness that a potential for coverage existed. However, in this case, Defendant argues that **loss reserves** are not relevant because the insurer's good faith or bad faith in investigating and evaluating a claim is determined by the manner in which the insurer conducted an investigation of the claim, the depth of its investigation and a determination of whether there was a good faith factual or legal question as to whether the loss was covered under the policy. <u>American Protection Ins. v. Helm Concentrates, Inc.</u>, 140 F.R.D. 448, 450 (E.D. Cal. 1991).

Here, the Court disagrees with Defendant. In <u>Lipton</u>, the court held that information related to an insurer's **loss** (or claim) **reserves** may be discoverable in a bad faith case. <u>Lipton</u>, 48 Cal. App. 4th at 1614. In this case, Plaintiff's claim of bad faith is that Defendant intentionally and unjustifiably delayed making payments to Plaintiff for which it knew (or should have known) Plain-

tiff was entitled, in an attempt to avoid reimbursing Plaintiff for all the losses covered by the policy. To this end, Plaintiff seeks Defendant's **loss reserve** information because it theorizes that Defendant knew from the outset that Plaintiff's claim was likely to be for a large sum of money, that Defendant employed a strategy of making unjustifiable demands for proof of loss, and delayed payments to Plaintiff for which entitlement had been established, in order to induce Plaintiff to accept a low settlement offer. (See <u>Bernstein</u>, 447 F.Supp. 2d at 1108).

Therefore, Defendant's **loss reserves** information is relevant to Plaintiff's inquiry into its claims of Defendant's bad faith in this case. Consequently, Plaintiff's Application to compel Defendant to produce information pertaining to its **loss reserves** is GRANTED.

On or before April 16, 2014, Defendants shall produce to Plaintiff document nos. 1-5, 7, 9, 15, 16 and 51 as noted on the December 6, 2013 Privilege Log,[3/] subject to a protective order to be entered into by the parties.

---

[3/] The Court notes that the document nos. on the December 6, 2013 Privilege Log noted above contain descriptions such as "Claim Notes re: Reserves," "Claim Notes" and "SIU Report." To the extent that any of the documents noted above pertain to Defendant's **loss reserves** information, they shall be produced. To the extent that any of the documents noted above pertain to Defendant's **expense reserves** information, they shall not be produced.

11cv2389

B. <u>Claims Handling and Employee Traning Standards</u>

Plaintiff seeks to compel Defendants to produce Defendant's written standards regarding the prompt investigation and processing of claims, training of claims personnel, and the identification and adjustment of suspected fraudulent claims from 2010 through 2013. These Requests for Production of Documents are identified as Requests for Production of Documents nos. 10-29.

Defendant objected to these Requests for Production of Documents as being vague, ambiguous, compound, unintelligible, overbroad, burdensome and oppressive because the Requests for Production of Documents are unlimited in scope, not relevant to any claim or defense in this action, and any responsive documents contain trade secrets and proprietary information.

Plaintiff asserts that Defendant's objections should be overruled because Defendant is required by California law to maintain the requested information. Plaintiff contends that the Requests for Production of Documents seek relevant information regarding an insurer's written standards and are discoverable because they can provide admissible evidence regarding an insurer's initial interpretation of key policy provisions, the structure of an insurer's claims process, and internal guidelines that the insurer requires its claims personnel to abide by with respect to the investigation, adjustment and management of insurance claims.

Defendant argues that Plaintiff's Requests for Production of Documents fail to provide any distinguishing or limiting language. Therefore, Plaintiff asks Defendant to produce a wide variety of documents, written standards, procedures, training manuals, and internal communications and documents related to *any* type of claim issue for four calendar years. Nevertheless, Defendant agreed to produce to Plaintiff its claims handling manuals in effect in 2010 and 2011.

The Court has reviewed Plaintiff's Requests for Production of Documents nos. 10-29, and agrees with Defendant that the Requests for Production of Documents are vague, ambiguous, and overbroad because they are unlimited in scope such that it would be burdensome and oppressive for Defendants to fully respond. While some of the Requests for Production of Documents may seek information that is relevant to claims and defenses in this action, Plaintiff has failed to limit the Requests for Production of Documents to the type of insurance claim for which it seeks standards, procedures, training manuals and internal communications and documents. Further, Plaintiff vaguely seeks documents regarding *any type* of insurance claim for a time span of four years. Plaintiff fails to explain why it has not limited the types of insurance claims for which it seeks information, why such a time span is appropriate for the documents it seeks, and why it is entitled to invade Defendant's trade secrets and

proprietary information. Consequently, Defendant's objec-
tions to Requests for Production of Documents nos. 10-29
are SUSTAINED.

      C. <u>Attorney-Client Privileged Documents</u>

      Plaintiff has requested that Defendant produce its
entire claim file. Defendant produced to Plaintiff all
relevant, non-privileged documents in the claim file, but
redacted and withheld from production documents it be-
lieved were protected by the attorney-client privilege and
work product doctrine. As previously noted, Defendant
produced to Plaintiff the December 6, 2013 Privilege Log
for the redacted and withheld documents. On February 3,
2014, Defendant produced to Plaintiff and filed a revised
privilege log.

      Also, on February 3, 2014 Defendant filed the
Declaration of Patricia Daza-Luu (to which the February 3,
2014 Privilege Log is attached), which states in pertinent
part that Defendant "has agreed to produce all correspon-
dence between Steven Turner (Defendant's coverage counsel)
and his retained consultants at Hagen, Streiff, Newton &
Oshiro Accountants... Werlinger & Associates, and ACS
Consultants... This includes correspondence with the
following persons identified in Defendant's (December 6,
2013) privilege log..." as identified in footnote 2 of
this Order.

1          1. <u>Factual Background</u>

2          Plaintiff occupied the first floor of 7630 Fay

3     Avenue, La Jolla, California ("Fay Ave Property"), where

4     it operated a spa and retail shop. Dianne York ("York") is

5     the president of Plaintiff. The second floor of the Fay

6     Ave Property was occupied by the medical practice of

7     York's former husband, Dr. Mitchell Goldman ("Goldman").

8          On or about September 18, 2009, Goldman vacated the

9     Fay Ave Property, and moved his medical practice and

10    equipment to another location, in accordance with the

11    terms of York's and Goldman's divorce judgment. Plaintiff

12    contends that Goldman, and/or persons acting on his

13    behalf, stole medical and office equipment from the Fay

14    Ave Property.

15         On or about January 26, 2010, Defendant received

16    notice of the alleged September 18, 2009 theft. [Declara-

17    tion of Erin Farley ("Farley"), February 3, 2014, Exh. 2,

18    hereafter "Farley Dec."). On February 22, 2010, Farley,

19    Defendant's insurance adjuster assigned to Plaintiff's

20    claim, sent York a letter that requested documents and

21    information to substantiate Plaintiff's claim.

22         By March 29, 2010, Plaintiff produced documentation

23    to Defendant, including the York-Goldman divorce judgment

24    and a claim spreadsheet of Plaintiff's claimed inventory

25    that allegedly had been stolen. (Farley Dec., paras. 7-

26    10). The divorce judgment specifically stated that Goldman

27    could "take... the equipment on the second floor of

28

11cv2389

Plaintiff..." (Farley Dec., paras. 7-10). However, the claim spreadsheet submitted by Plaintiff included items from the second floor of the Fay Ave Property. (Farley Dec., paras. 10-11, Exh. 5). According to the York-Goldman divorce judgment, the items taken from the second floor of the Fay Ave Property appeared to belong to Goldman, and if so, were not wrongfully taken. (Farley Dec., para. 11).

The Farley Dec. also states in pertinent part:

(1) In late March 2010, Defendant retained the law firm of Jones Turner, LLP, to assist it by taking the Examinations Under Oath ("EUO") of Plaintiff and *to provide coverage advice*. (Farley Dec., para. 12, emphasis added).

(2) Farley intended that all communications between Defendant and Jones Turner, LLP would be privileged and confidential. (Farley Dec., para. 13).

(3) The attorneys at Jones Turner, LLP, Alan Jones and Steven Turner ("Turner") were not, and are not, employees of Defendant. Throughout the course of the administration of Plaintiff's claim, *Farley sought coverage advice from Turner*. (Farley Dec., para. 14, 39, emphasis added).

(4) On August 25, 2010 and January 25, 2011, Farley attended York's EUO. At the August 25, 2010 and January 25, 2011 EUOs, York testified that she would provide many of the documents requested by Turner and Defendant, but that had not yet been provided, to support Plaintiff's

claim. At the conclusion of the January 25, 2011, York requested an advance payment from Defendant. (Farley Dec., para. 16).

(5) On January 31, 2011, Defendant made an advance payment of $250,000 to Plaintiff Fay Ave Properties. The payment was conditioned upon York's representations, which Defendant assumed to be true for the purposes of the payment. On January 31, 2011, Farley sent York a letter that detailed the reasoning and conditions on which Defendant's advance payment was made. (Farley Dec., para. 18, Exh. 6).

(6) Jones Turner, LLP did not have the authority to grant or deny advance payment requests made to Defendant, and did not make the decision to make the $250,000 advance payment. (Farley Dec., para. 19).

(7) On February 7, 2011, Plaintiff's attorney sent an email to Turner that requested an additional advance payment from Defendant. On February 9, 2011, Farley responded to the February 7, 2011 email by highlighting that Plaintiff had failed to provide to Defendant many documents to substantiate its claim that Plaintiff had previously agreed to provide to Defendant. The request for the additional advance payment was denied. (Farley Dec., paras. 20-21, Exh. 7).

(8) On April 22, 2011, Farley attended another session of York's EUO. At the EUO, York produced a box of documents that purportedly substantiated Plaintiff's

claim. The EUO was suspended to allow York to produce additional documents to Defendant. (Farley Dec., para. 23).

(9) After the April 22, 2011 EUO, Farley learned from Turner that Plaintiff's attorney requested an advance payment from Defendant. On April 27, 2011, Farley sent a letter to Plaintiff's attorney which states, *inter alia*, that Plaintiff had failed to provide to Defendant many documents to substantiate its claim that Plaintiff had previously agreed to provide, that Plaintiff had added new items to its claim that had not been previously identified, that during the April 22, 2011 EUO, York was unable to provide basic information regarding Plaintiff's claim, and that it was Plaintiff's duty and responsibility to provide correct information in support of the claim. The request for an advance payment was denied. (Farley Dec., para. 24, Exh. 8).

(10) On April 29, 2011, Plaintiff's attorney sent Turner a revised inventory of allegedly stolen items. The revised inventory increased the number of stolen items from approximately 200 to over 1,000 items, and had increased the claim by millions of dollars. (Farley Dec., para. 25).

(11) On May 23, 2011, York sent Farley and Turner an email that requested another advance payment. On May 27, 2011, Farley sent a letter to York which provided a detailed account of Plaintiff's claim history, and noted

that Plaintiff's failure to provide to Defendant requested information about its claim had prevented Defendant from completing its investigation. The request for advance payment was denied. (Farley Dec., para. 28-29, Exh. 10).

(12) On June 2, 2011, Plaintiff's attorney sent Turner another updated claim inventory. Turner sent the updated claim inventory to Farley. The updated claim inventory had over 1000 line items and was valued at over $13 million. (Farley Dec., para. 32).

(13) On July 19, 2011, Farley received an email from Plaintiff's attorney which asked for a $1 million advance payment. On July 20, 2011, Farley responded that Defendant could not fully respond to Plaintiff's claim, and that it would not pay another advance without completing York's EUO. (Farley Dec., para. 34, Exh. 13).

(14) In late October/early November 2011, Turner forwarded to Farley an email from Plaintiff's attorney that requested an advance payment from Defendant. On November 11, 2011, Farley responded that Defendant's investigation of Plaintiff's claim was still ongoing and that Defendant continues to assess Plaintiff's claim. The request for the advance payment was denied. (Farley Dec., para. 37, Exh. 14).

(15) By November 2011, it became clear to Farley, based on correspondence from Plaintiff's attorney, that York was refusing to complete her EUO. For this reason, *inter alia*, Defendant denied Plaintiff's claim. Defendant

1    made the decision to deny coverage for Plaintiff's claim.

2    (Farley Dec., para. 38)

3        (16) Several persons who appear on Defendant's

4    December 6, 2013 Privilege Log, but who were not identi-

5    fied at that time, are identified as employees of Defen-

6    dant who were involved the in the administration of

7    Plaintiff's claim.[4/]

8        The Declaration of Steven D. Turner ("Turner Dec.")

9    states in pertinent part:

10       (1) *Jones Turner LLP served as coverage counsel for*

11   *Defendant for Plaintiff's claim* from approximately March

12   2010 through early 2013. (Turner Dec., para. 1, emphasis

13   added).

14       (2) In late March 2010, *Defendant gave Jones Turner*

15   *LLP the assignment to provide coverage advice* and conduct

16   EUOs in connection with Plaintiff's claim. In July 2010,

17   Turner took over as the principal attorney for the assign-

18   ment. Alan Jones had previously been the principal attor-

19   ney for the assignment. (Turner Dec., para. 2).

20       (3) From August 3, 2010 to November 18, 2010, Turner

21   requested that Plaintiff's attorney provide him with the

22   documents Plaintiff contends will substantiate its claim.

23

24   _____

25       [4/]These persons are: Joseph Salko, Defendant's in-house counsel; Wendy
     Hansen, Defendant's underwriter; Daniel McLaughlin, Defendant's Director; Lisa
26   Melillo, Defendant's in-house counsel; Mary Galvin, Defendant's in-house counsel,
     Verdis Skates, Defendant's Prosecution Coordinator; and Matt Huls, Defendant's
27   Investigative Services - Manager of Field Operations. Ron Burnovski, who was not
     identified in Defendant's December 6, 3013 Privilege Log, is one of Turner's
     partners at Jones Turner LLP who provided Turner with assistance in assessing the
28   coverage issues in this case. (Declaration of Steven D. Turner, para. 49).

On November 18, 2010, Turner was provided with a few documents. (Turner Dec., paras. 3-8).

(4) On August 25, 2010, Turner conducted an EUO of York. The EUO could not be completed because Plaintiff had not yet provided to Turner all documents related to the nature and scope of the alleged loss. At the EUO, York agreed to provide additional documents in support of Plaintiff's claim. (Turner Dec., para. 4).

(5) On January 25, 2011, Turner conducted another session of the EUO of York. At the EUO, York's testimony indicated that various documents promised to be produced at the August 25, 2010 EUO had not been produced. (Turner Dec., para. 10).

(6) On January 26, 2011, Plaintiff's attorney provided Turner with documents that partially supported Plaintiff's claim. (Turner Dec., para. 11).

(7) Turner had no power to authorize claim payments made by Defendant. The scope and purpose of Turner's retention by Defendant was to complete the EUO and *provide coverage advice to Defendant.* (Turner Dec., para. 13, emphasis added).

(8) From February 9, 2011 to April 22, 2011, Turner and Farley continued to ask Plaintiff to provide documents to support Plaintiff's claim and to provide documents that had been promised by York, but had not yet been produced. (Turner Dec., paras. 15-20).

(9) On April 22, 2011, Turner conducted another session of York's EUO. At the EUO, York produced to Turner a new box containing documents. Turner and Plaintiff's counsel agreed to suspend the EUO to another date, due to York's production to Turner of more documents. At the EUO, York identified new items for which Plaintiff sought recovery. (Turner Dec., paras. 21, 23).

(10) On April 29, 2011, Plaintiff's attorney sent Turner a revised claim inventory spreadsheet that detailed Plaintiff's claimed losses. The spreadsheet increased the claim from 238 line items to over 1,000 line items. (Turner Dec., para. 23, Exh. 25).

(11) On April 29, 2011, Turner sent an email to Plaintiff's counsel that requested that Plaintiff produce all supporting documentation regarding the new items identified in the April 22, 2011 EUO. By May 4, 2011, Turner had not received a response to his email. (Turner Dec., para. 24).

(12) On May 5, 2011, Plaintiff's attorney sent Turner a re-revised claim inventory spreadsheet, with some additional documents. The re-revised inventory increased Plaintiff's claim to approximately 1,114 line items, which totaled over $13 million in value. (Turner Dec., para. 25, Exh. 27).

(13) On May 12, 2011, Turner renewed his request to Plaintiff for further documentation to support Plaintiff's claim. York responded by requesting that Defendant conduct

the next session of her EUO, but failed to provide Turner with additional information regarding the May 5, 2011 spreadsheet. (Turner Dec., para. 27).

(14) On May 13, 2011, Plaintiff's attorney informed Turner that Turner "may deal with Ms. York directly." (Turner Dec., para. 28, Exh. 29).

(15) On May 27, 2011, Plaintiff's attorney sent an email to Turner that confirmed that Plaintiff had still not produced all documents it promised to produce. (Turner Dec., para. 33, Exh. 34).

(16) On June 2, 2011, Plaintiff's attorney sent an email to Turner which Turner understood to be the final revised inventory spreadsheet of the losses sustained by Plaintiff. (Turner Dec., para. 34, Exh. 35).

(17) On July 12, 2011, Turner conducted another session of York's EUO. The EUO could not be completed due to the significant number of new items that had been added to Plaintiff's claim. (Turner Dec., para. 39).

(18) The parties agreed that the fifth session of York's EUO would be conducted on August 4, 2011. On August 3, 2011, Turner received an email from Plaintiff's attorney that cancelled the August 4, 2011 EUO. Turner wrote to Plaintiff's attorney to reschedule the fifth session of York's EUO. Plaintiff's attorney did not respond to Turner's letter. No further EUO of York was scheduled. (Turner Dec., paras. 42-46).

(19) On December 20, 2011, Turner sent York and Plaintiff's attorney a letter that detailed Defendant's denial of Plaintiff's claim. (Turner Dec., para. 47, Exh. 43).

## 2. Applicable Law

### a. California Law Applies

The Court's jurisdiction over this case arises from the diversity of the parties. In diversity cases, the Court must decide privilege issues in accordance with state law. Fed. R. Evid. 501. Therefore, California law applies to the determination of privilege issues in this case.

### b. Attorney-Client Privilege Under California Law

Under California law, the attorney-client privilege, affords a privilege to the client "to refuse to disclose, and to prevent another from disclosing, a confidential communication between a client and lawyer..." Cal Evidence Code § 954. A confidential communication between a client and a lawyer is defined as:

> information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of a purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship.
> Cal. Evidence Code § 952.

11cv2389

"The privilege is absolute and disclosure may not be ordered, without regard to relevance, necessity or any particular circumstance peculiar to the case... The party claiming the privilege has the burden of establishing the preliminary facts necessary to support its exercise, i.e. a communication made in the course of an attorney-client relationship... Once that party establishes facts necessary to support a *prima facie* claim of privilege*,* the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish the communication was not confidential or that the privilege does not for other reasons apply." <u>Costco Wholesale Corp. v. Superior Court</u>, 47 Cal. 4th 725, 732-733 (2009)(citations omitted), <u>Umpqua Bank v. First American Title Insurance Co.</u>, 2011 WL 997212 at *2 (E.D. Cal. 2011).

In <u>Costco</u>, the California Supreme Court stated that in a bad faith case between an insured and an insurer, a court should "determine the dominant purpose *of the relationship* between the insurance company and its in-house attorneys, i.e. was it one of attorney-client or one of claims adjuster-insurance corporation." <u>Costco</u>, 47 Cal. 4th at 739-740 (emphasis in original).

Here, the issue raised by Plaintiff is whether Jones Turner, LLP was hired by Defendant to give its legal opinion or whether it was hired to take over the claims adjuster role and to shield Defendant from liability on

11cv2389

the bad faith claim. Where the answer appears to be both, the court must make a determination of which purpose was primary. <u>Umpqua Bank</u>, 2011 WL 997212 at *3.

It is clear to the Court that Jones Turner, LLP performed both the function of attorney hired to render legal opinions regarding coverage under the insurance policy at issue, *and* the function of a claim adjuster assigned to take EUOs. However, based on the representations of Farley, Defendant's claim adjuster assigned to Plaintiff's claim, and the representations of Turner, the attorney at Jones Turner, LLP who performed work on Plaintiff's claim, the Court finds that the dominant purpose of the relationship between Defendant and Turner was one of attorney-client, not claims adjuster-insurance corporation.

Specifically, Farley has stated that (1) she received a copy of the York-Goldman divorce judgment, a legal document that required interpretation, to clarify what property Plaintiff alleged was stolen. (Farley Dec., para. 11), (2) she specifically retained Jones Turner, LLP to assist Defendant in taking EUOs and *to provide coverage advice* (Farley Dec., para. 12 emphasis added), (3) she intended that all communications between Defendant and Jones Turner, LLP would be privileged and confidential (Farley Dec., para. 13), (4) the attorneys at Jones Turner, LLP were not, and are not, employees of Defendant (Farley Dec., para. 14), (5) Turner conducted several

11cv2389

sessions of York's EUO, but that throughout the course of the administration of Plaintiff's claim, *she sought coverage advice from Turner* (Farley Dec., paras. 14, 16, 23, 39, emphasis added), and (5) Defendant, not Turner, made the decision to deny coverage for Plaintiff's claim (Farley Dec., para. 38), and she wrote several letters to Plaintiff and Plaintiff's attorneys regarding Plaintiff's requests for advance payments. (Farley Dec., paras. 20-21, 24, 32, 34, 37, Exhs. 7, 8, 10, 13, 14).

Further, Turner has stated that (1) in late March 2010, *Defendant gave Jones Turner LLP the assignment to provide coverage advice* and conduct EUOs in connection with Plaintiff's claim. (Turner Dec., para. 2 emphasis added), (2) *Jones Turner, LLP served as coverage counsel for Defendant* for Plaintiff's claim from approximately March 2010 through early 2013. (Turner Dec., para. 1 emphasis added), and (3) he sent York and Plaintiff's attorney a letter that detailed the legal and factual reasons for Defendant's denial of Plaintiff's claim. (Turner Dec., para, 47, Exh. 43).

The Court finds that Defendant has met its burden of establishing the preliminary facts necessary to support a *prima facie* claim of attorney-client privilege for information that was transmitted in confidence between Jones Turner, LLP and Defendant in the course of the attorney-client relationship. Further, Plaintiff has not met its burden of proof to establish that the communications at

issue were not confidential or the privilege does not apply for other reasons. Therefore, the information transmitted between Defendant and Jones Turner, LLP need not be disclosed. See <u>Umpqua Bank</u>, 2011 WL 997212 at *3-4.

Plaintiff argues that Defendant has failed to establish the elements of the attorney-client privilege for each document withheld by Defendant. Defendant argues that it is not required to establish the elements of the attorney-client privilege for each withheld document. Rather, it can meet its burden by showing that the dominant purpose of the relationship between itself and its attorney was one of attorney-client, and not one of claims adjuster-insurance company.

Plaintiff cites <u>2022 Ranch, L.L.C. v. Superior Court</u>, 113 Cal. App. 4th 1377 (2003) in support of its position. In <u>2022 Ranch</u>, the court held that the results of the factual investigation done by the insurance company's in-house attorneys was not privileged, as the attorneys were serving as claim adjusters in performing the investigation. However, the court also held that communications by the attorneys that reflected rendering of legal advice were attorney-client privileged. Therefore, it ordered the trial court to review each of the communications to determine their dominant purpose. <u>Id.</u> at 1387.

11cv2389

However, the California Supreme Court in Costco disapproved of 2022 Ranch, in part. The Costco court found that the 2022 Ranch court erred in distinguishing between the communication of the results of the factual investigation done by the attorneys and the attorneys' communications reflecting the rendering of legal advice to the insurance company. The Costco court held that the "proper procedure would have been for the trial court first to determine the dominant purpose *of the relationship* between the insurance company and its attorneys, i.e. was it one of attorney-client or one of claims adjuster-insurance corporation..." Costco, 47 Cal. 4th 725, 739-740, Umpqua Bank, 2011 WL 997212 at *2. "The (insurance company has) the burden of establishing the preliminary facts that the communication*s* were made during the course of an attorney-client relationship. Costco, 47 Cal 4th 725, 740 (emphasis added). The California Supreme Court's disapproval of 2022 Ranch has also been recognized by Bonfigli v. Strachan, 192 Cal. App. 4th 1302 (2011) and Hawker v. BancInsurance, 2013 WL 6843088 (E.D. Cal. 2013).

The Costco court joined together all the communication*s* between the attorneys and the insurance company that reflected the communications of factual information and the rendering of legal advice. This approach has been followed by Costco's progeny. See Umpqua Bank, 2011 WL 997212 at *1 ["(Defendant counters that Plaintiff 'is improperly attempting to obtain document*s* that were created as a result of (defendant's) retention of an

outside, independent attorney to provide a coverage opinion...'"](emphasis added); <u>Ivy Hotel v. Houston Casualty Co.</u>, 2011 WL 4914941 at *2 ["Ivy Hotel requested document**s** concerning (Defendant's) 'handling of the claim for legal fees and expenses incurred in connection with (an underlying) cross-complaint.'"](emphasis added).

Where the dominant or primary purpose of the relationship is to provide legal advice and claims adjusting happens to occur as a collateral duty, as is the case here, Defendant need only establish a *prima facie* case that an attorney-client relationship exists. If Defendant is able to make this showing, then all documents and communications are protected by the privilege without the necessity of having to make individualized showings as to each communication or document. This approach makes sense, especially in document-intensive cases, as it would be potentially unduly burdensome to, if not outright invasive of, the attorney-client relationship to require the party who has established an attorney-client relationship to justify each and every communication as privileged. Conversely, if it is determined that the primary role of the attorney is to adjust the claim and legal advice is provided as a collateral duty, then, as Plaintiff argues, it would make sense to require Defendant to itemize each communication and justify those to which the privilege is claimed. But this is not the case here.

As a result of the foregoing, the Court finds Plaintiff's argument in this regard to be unavailing.

1    Defendant is not required to establish the elements of the
2    attorney-client privilege for each document it has with-
3    held from production to Plaintiff.

4         Also, Plaintiff argues that Defendant has not
5    established that the dominant purpose of its relationship
6    with its attorney was for the rendering of legal advice
7    because Defendant has not shown for what legal issue(s)
8    legal advice was sought. Plaintiff argues that in <u>Costco</u>,
9    and its progeny, the courts in those cases noted, and
10   quoted from submitted declarations, the issues for which
11   legal advice was sought. Therefore here, since the Farley
12   Dec. and the Turner Dec. do not identify the issues for
13   which legal advice was sought, Defendant has failed to
14   meet its burden in proving the dominant purpose of its
15   relationship with its attorneys. Plaintiff does not cite
16   any authority for its position.

17        The Court finds that Plaintiff's argument in this
18   regard is unavailing. Neither <u>Costco</u>, nor its progeny
19   require that the issues for which legal advice was sought
20   to be noted or explained by the insurance adjuster or the
21   attorney for the insurance company. In fact, the <u>Costco</u>
22   court explained that in a situation where an insurance
23   company hires an attorney to provide legal advice, "(t)he
24   attorney (is) given a legal document (the insurance
25   policy) and (is) asked to interpret the policy and to
26   investigate the events that resulted in damage to deter-
27   mine whether (the insurance company is) legally bound to
28   provide coverage for such damage." <u>Costco</u>, 47 Cal. 4th 725,

736, citing <u>Aetna Casualty & Surety Co. v. Superior Court</u>, 153 Cal. App. 3d 467, 476 (1984).

Here, the Court finds that Defendant did just what the <u>Costco</u> court envisioned. As a result, the Court finds that Defendant need not specifically identify the issues for which it sought legal advice from its attorney to adequately show the dominant purpose of its relationship with its attorney.

III

<u>CONCLUSION</u>

1. Plaintiff's Application to compel production of documents pertaining to Defendant's expense reserves is DENIED.

2. Plaintiff's Application to compel production of documents pertaining to Defendant's loss reserves is GRANTED.

3. Plaintiff's Application to compel production of documents pertaining to Defendant's Claims Handling and Employee Training Standards is DENIED.

4. Plaintiff's Application to compel production of documents pertaining to the documents withheld by Defendant based on the attorney-client privilege is DENIED.

IT IS SO ORDERED.

DATED:  April 1, 2014

Hon. William V. Gallo
U.S. Magistrate Judge

11cv2389