1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10

FAY AVENUE PROPERTIES, LLC,
LA JOLLA SPA MD, INC.,

CASE NO. 11cv2389-GPC(WVG)

11
12

Plaintiffs,

vs.

**ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT**

13
14

TRAVELERS PROPERTY
CASUALTY COMPANY OF
AMERICA; AND DOES 1 through
100, inclusive,

[Dkt. Nos. 123, 136.]

15
16

Defendant.

17
18

Before the Court is Defendant Travelers Property Casualty Company of

19

America's motion for summary judgment, or alternatively partial summary judgment

20

as to claims brought against it by Plaintiffs La Jolla Spa MD, Inc. and Fay Avenue

21

Properties, LLC.[1]  Plaintiff La Jolla Spa MD, Inc. filed an opposition. (Dkt. No. 128.)

22

A reply was filed by Defendant. (Dkt. No. 133.) The Court finds that there are genuine

23

issue of material fact whether the insurance policy was voided based on Plaintiff's

24

failure to comply with the Examination Under Oath ("EUO") condition and violation

25

of the concealment, misrepresentation and fraud provision in the insurance policy.

26

After a review of the briefs, supporting documentation, and the applicable law, the

27
28

[1]On September 12, 2014, Plaintiff Fay Avenue Properties, LLC and Defendant
Travelers filed a notice of settlement.  Accordingly, the motion for summary judgment
as to Fay Avenue Properties, LLC is denied as moot.

- 1 -

[11cv2389-GPC(WVG)]

Court DENIES Defendant's motion for summary judgment.

### Procedural Background

Plaintiffs Fay Avenue Properties, LLC ("Fay") and La Jolla Spa MD, Inc. ("LJS") filed a complaint against Defendant Travelers Property Casualty Company of America ("Travelers") on August 26, 2011.  (Dkt. No. 1.)  The Complaint alleges causes of action for breach of contract; breach of the implied covenant of good faith and fair dealing; fraudulent concealment; and negligence for Defendant's failure to pay under the insurance policy.  (Id.)  Plaintiff also seeks to recover punitive damages.  (Id.)

### Factual Background

As of September 18, 2009, Fay owned a two-story spa and medical facility located at 7630 Fay Avenue, La Jolla, California ("Fay Avenue property").  (D's Separate Statement of Undisputed Material Facts ("UF") 1.)[2]  During that time, Fay's sole member and owner was Dianne York-Goldman ("York").  (UF 2.)  York was the CEO, President and owner of LJS.  (UF 4.)  LJS occupied the bottom floor of the Fay Avenue property, where it operated a spa and retail shop, as well as having two offices on the second floor of the Fay Avenue property.  (UF 3.)

Travelers issued Policy Number I-680-5223M909-TIL-09 to Fay and LJS, which was effective July 1, 2009 through July 1, 2010 ("Policy").  (UF 5.)  The Policy provides coverage for building, business personal property, and business income/extra expense losses (hereinafter "business income"), subject to certain terms, conditions, and exclusions.  (UF 6.)

The claim giving rise to this suit emanates from York's divorce from Dr. Goldman.  Prior to the divorce, the two owned multiple businesses, including Fay, LJS, Cosmetic Vein Surgery Center ("CVSC"), and Dermatology Cosmetic Laser Associates ("DCLA").  (UF 7.)  CVSC and DCLA leased offices, exam rooms, and a

---

[2]In the Factual Background, the Court cites to the Separate Statement of Undisputed Material Facts  that are not disputed by the parties.  (See Dkt. No. 128-2, P's Response to Separate Statement of Facts.)

surgical suite on the second floor of the Fay Avenue property. (UF 8.) Pursuant to the divorce settlement between York and Mr. Goldman signed on or about August 22, 2009, York was awarded Fay and LJS, while Dr. Goldman was awarded CVSC and DCLA. (UF 9.) The divorce judgment further provided:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Respondent [Dr. Goldman] take as part of CVSC & DCLA, the equipment on the second floor of La Jolla Spa MD, including but not limited to the liposuction equipment, except for all equipment in the surgical suites, which includes the lights and anesthesia equipment and other fixtures attached to the building . . .

(UF 10.) The judgment also ordered Dr. Goldman to vacate the Fay Avenue property by December 31, 2009. (UF 11.) If he moved out before that date, he was to provide 30 days' notice. (Dkt. No. 128-10, LJS Exs., Ex. 8 at 45.)

On or about September 18, 2009, Plaintiff alleges that the Fay Avenue property was the subject of a large-scale theft ("Loss"), perpetrated by Dr. Goldman and his associates. (UF 12.) Four months later, on or about January 25, 2010, Plaintiffs Fay and LJS submitted their insurance claim ("Claim") to Travelers. (UF 13.) On February 22, 2010, Travelers' adjuster, Erin Farley ("Farley"), wrote a letter requesting documents including a "detailed inventory of the contents being claimed." (UF 15.)

In that letter, Farley stated that the coverage for business personal property was $2.1 million. (Dkt. No. 128-10, LJS Exs., Ex. 9.) On March 1, 2010, Farley and Travelers' representative Fabiana Greenwell met with York and Plaintiff's CFO Karin Wise ("Wise") at the Fay Avenue property. (UF 16.)

During March 2010, Plaintiff provided Farley with documents she requested in her February 22, 2010 letter. (Dkt. No. 128-10, LJS Exs., Ex. 17 at 335-500[3].) On March 29, 2010, Wise emailed Defendant an insurance claim spreadsheet detailing about 230 line items and asserting a claim valuation of $2.8 million. (Dkt. No. 123-11, Daza-Luu Decl, Ex. 13 at 110.)

On April 2, 2010, Travelers' outside coverage counsel, Alan Jones ("Jones") of

---

[3]The page numbers are based on the CM/ECF pagination.

Jones & Turner, wrote to Plaintiff, confirming that his firm had been retained to take Plaintiff's EUOs in connection with the Claim.  (UF 19.)  In that letter, Jones listed the topics that would be addressed at the examinations and requested a list of fourteen documents or category of documents to determine rights, obligations and to assess the amount of the covered loss.  (Dkt. No. 123-11, Daza-Luu Decl., Ex. 13 at 118.)  Wise indicated that she would provide the documents by April 30, 2010.  (Dkt. No. 123-11, Daza-Luu Decl., Ex. 13 at 125.)

As a follow up to the documents, on May 7, 2010, and June 7, 2010, Jones wrote to Jennifer Hasso, ("Hasso") York's attorney, requesting the documents.  (Dkt. No. 123-3, D's RJN, Ex. 1, Jones Decl. ¶¶ 4, 5 at 2; Dkt. No. 123-11, Daza-Luu Decl., Ex. 13 at 125-28.)  On June 14, 2010, Hasso forwarded some documents but the production was not complete as it specifically failed to address eight specific categories of documents in the April 2, 2010 letter.  (Dkt. No. 123-3, D's RJN, Ex. 1, Jones Decl. ¶ 6.)  On June 23, 2010, Jones sent another letter to York, through Hasso, specifically stating "many" documents were received but stated what documents were missing and also requested to schedule an EUO.  (Dkt. No. 123-3, D's RJN, Ex. 1 at 2, Jones Decl. ¶ 7; Dkt. No. 123-11, Daza-Luu Decl., Ex. 13 at 129.)  On August 4, 2010, Steven Turner ("Turner")[4] wrote a letter to York stating that he had not yet received the remaining documents and requested to have the documents a week prior to the EUO examination.  (Dkt. No. 123-11, Daza-Luu Decl., Ex. 13 at 131.)  These documents were not received by the scheduled August 25, 2010 EUO.  (Dkt. No. 123-3, D's RJN, Ex. 3, Turner Decl. ¶ 4 at 34.)

The first EUO was held on August 25, 2010.  (Dkt. No. 123-13, Daza-Luu Decl., Ex. 16, EUO Vol. 1.)  At the EUO, York testified that Wise, the CFO for both properties, prepared the March 29, 2010 inventory.  (Dkt. No. 123-13, Daza-Luu Decl., Ex. 16, EUO Vol. 1 at 12:8-15.)  In preparing the document, York and Wise walked through the entire building and itemized everything that was in the building.  (Dkt. No.

---

[4]Steven Turner took over as the coverage attorney in August 2010.

123-13, Daza-Luu Decl., Ex. 16, EUO Vol 1 at 13:4-11.)  According to Plaintiff, the inventory was what they were asked to give Travelers.  (Id. at 13:12-14.)  When asked whether the document listed all the losses and damages that were claimed, she responded that she didn't know and would have to go through it.  (Id. at 13:15-18.)  When asked again whether the document include all loses, York responded "I provided everything that was asked."  (Id. at 14:8-14.)  When Travelers stated it was still waiting for documents in categories, D, G, I, J, K, L, M, and N in the April 2, 2010 letter, York responded that she produced everything she had and she also asserted that she did not know if the document production was complete.  (Id. at 72:1-7.)  She stated she made a diligent search to produce the documents requested.  (Id. at 72:17-25.)  At the end of the EUO, the parties agreed to reschedule the EUO session and York's counsel would work on getting additional documents.  (Id. at 169:15-25.)

On September 7, 2010, Turner wrote a follow up letter requesting that the additional documents be provided by September 30, 2010.  (Dkt. No. 123-11, Daza-Luu Decl., Ex. 13 at 132.)  On October 1, 2010, Turner sent Hasso an email regarding the lack of response to his letter of September 7, 2010.  (Dkt. No. 123-3, D's RJN, Ex. 3 at 48.)  In a letter dated October 12, 2010, Hasso acknowledged receipt of the September 7, 2010 letter and stated that the additional documents would be provided no later than October 20, 2010 along with a confirmation that all documents responsive to the request have been produced.  (Dkt. No. 123-11, Daza-Luu Decl., Ex. 13 at 133.)  On October 22, 2010, Turner wrote a letter to York, through Hasso, that he had not received the documents as promised in Hasso's letter.  (Dkt. No. 123-11, Daza-Luu Decl., Ex. 13 at 136.)

On November 8, 2010, Hasso emailed Turner apologizing for the delay and indicated she received all documents previously not produced per the April 2 letter. (Dkt. No. 123-11, Daza-Luu Decl., Ex 13 at 137.)  On November 18, 2010, Turner visits Hasso's office and is provided with some documents.  (UF 38.)

On January 25, 2011, the second EUO session was held.  (UF 39.)  At the EUO,

the parties agreed that there were still outstanding documents and Hasso was going to make her best efforts to get those documents as quickly as possible.  (Dkt. No. 123-13, Daza-Luu Decl., Ex. 17 at 167.)  They agreed to suspend the EUO and reconvene as soon as Travelers received and reviewed the documents.  (Id.)

At the conclusion of the EUO, Plaintiff asked for an advance as there was a $360,000 note due on the Fay Avenue property.  (UF 41.)  On January 31, 2011, Travelers issued an advance payment of $250,000. (Dkt. No. 123-11, Ex. 13 at 180.)  York denied ever having received the payment but states she received funds from that check.  (Dkt. No. 123-11, Ex. 13, York Depo. at 226:15-19; 227:1-5; 24-25.)

From January 26, 2011 to April 2011, Plaintiff produced additional sets of documents to Travelers.  (UF 43.)  On February 8, 2011, Plaintiff's new counsel Kenneth Fitzgerald, requested an additional advance from Travelers.  (UF 44.)  On February 9, 2011, Travelers denied the request for an additional advance payment because Travelers still did not have critical documents concerning the ownership and value of the claimed property.  (Dkt. No. 123-11, Daza-Luu Decl., Ex. 13 at 187.)

On April 7, 2011, April 8, 2011, and April 15, 2011, Turner asked Plaintiff for confirmation that all requested documents have been produced so that the third EUO session could proceed.  (Dkt. No. 123-3, D's RJN, Ex. 3, Turner Decl. ¶¶ 16, 17, 19; Dkt. No. 123-3, D's RJN, Ex. 3, Turner Decl., Exs. 21, 22, 23.)  On April 15, 2011, York stated in an email, "[y]es, there are more further documents, but these should not cause significant delay." (Dkt. No. 123-3, D's RJN, Ex. 3 Turner Decl., Ex. 24; Dkt. No. 123-11, Daza-Luu Decl., Ex. 13 at 191-92.)  She asked that the EUO proceed on April 22, 2011.  (Id.)  In that email, she also expressed concern that an unreasonable amount of time had gone by, about a year, since Turner was engaged by Travelers. (Id.)  She stated that all material facts were revealed at the first two EUOs and that any further examinations were unnecessary and unreasonable. (Id.)  She also suggested that a payment should be made as to those claims which are clearly not in dispute.  (Id.)

On April 22, 2011, at the third EUO session, York produced a new box full of

[11cv2389-GPC(WVG)]

documents.  (Dkt. No. 123-3, D's RJN, Ex. 3, Turner Decl. ¶ 21.)  During the examination, York testified to the additional items that should have been part of the claim that were not on the original March 29, 2010 claim spreadsheet. (Dkt. No. 123-11, Daza-Luu Decl., Ex. 13, York Depo. at 244:9-15; Dkt. No. 123-14, Daza-Luu Decl., Ex. 18, EUO Vol. 3 at 331:21-334:13.) The EUO was suspended until additional documents could be provided.  The parties also discussed Travelers' refusal to provide an additional advance.  (Dkt. No. 123-14, Daza-Luu Decl., Ex. 18, EUO Vol. 3 at 360:4-362:11.)  Fitzgerald emphasized that while Travelers did not have everything "perfectly organized", it had all the pictures showing equipment that was taken.  (Id.) He stated that it is undisputed that twenty-nine lasers were taken and that the claim would be much more than the $250,000 that was advanced.  (Id. at 361-362.) Fitzgerald asserted there was no reason why Travelers could not make another advance payment. (Id.)  Turner responded stating that they have been asking for documents for quite some time, are still getting documents, and are still getting additional claim items. (Id. at 360:4-24.)  Therefore, since Travelers did not have a clear understanding of the Claim, it was unable to make another advance.  (Id.)

On April 25, 2011, Fitzgerald sent an email to Turner asking for the equipment valuation consultant's spreadsheet that Travelers agreed to provide and where Plaintiff agreed to work off of to supplement Plaintiff's claim spreadsheet. (Dkt. No. 123-11, Daza-Luu Decl., Ex. 13 at 190.)  He also commented that the delay in moving the process is exacerbating York's financial distress.  (Id.)  In response, on the same day, Turner sent an email to Plaintiff's counsel asking her to complete a claims worksheet and to meet with Travelers' experts to identify "any additional information that is missing." (Dkt. No. 123-11, Daza-Luu Decl., Ex. 13 at 189.)

On April 27, 2011, Turner sent an email to Fitzgerald asking about the status of the inventory and to confirm the planned meeting with Travelers' experts.  (UF 56.) York confirmed that a meeting between Plaintiffs and Travelers' experts never took place. (UF 57.) On the same day, Travelers sent a letter denying Plaintiff's request for

1   an additional advance payment and asked Plaintiff to provide information necessary

2   for Travelers to complete its claim investigation.  (Dkt. No. 123-11, Daza-Luu Decl.,

3   Ex. 13 at 201.)

4        On April 29, 2011, Plaintiff's counsel sent a revised claim inventory containing

5   over 1000 line items.  (Dkt. No. 123-12, Daza-Luu Decl., Ex. 13 at 2.)  On May 4,

6   2011, York responded "yes" to Turner's email asking whether the revised spreadsheet

7   represents an insurance claim to Travelers for the property damaged or taken by Mr.

8   Goldman when he vacated the building in September 2009.  (Dkt. No. 123-12, Daza-

9   Luu Decl., Ex. 13 at 39.)  At the 30(b)(6) deposition held on July 9, 2014, York stated

10  that as she is now looking at the May 4, 2011 email, she should have answered "no"

11  to Turner's question.  (Dkt. No. 123-11, Daza-Luu Decl., Ex. 13 at 60, LJS Depo. at

12  264:19-266:10.)  She stated that she was giving Travelers everything it asked for and

13  stated that Dr. Goldman did not take or damage everything listed on the spreadsheet.

14  (Id.)

15       On May 5, 2011, Plaintiff's counsel sent another revised claim inventory.  (Dkt.

16  No. 123-12, Daza-Luu Decl., Ex. 13 at 41.)  On May 20, 2011, Tobi Blatt, Plaintiff's

17  consultant, sent another revised claim inventory.  (Dkt. No. 123-12, Daza-Luu Decl.,

18  Ex. 13 at 99.)  On May 27, 2011, Farley responded to York's emails about delays

19  stating that the May 20, 2011 revised claim inventory was still missing key

20  information.  (Dkt. No. 123-12, Daza-Luu Decl., Ex. 13 at 137.)

21       On June 2, 2011, Blatt emailed the latest or "final" claim inventory to Turner and

22  stated that a complete binder with supporting documentation was being delivered to

23  Turner's office.  (Dkt. No. 123-12, Daza-Luu Decl., Ex. 13 at 147.)  On June 6, 2011,

24  Blatt requested information about the claim amount since York was working with a

25  company to advance her money against the claim with Travelers stating that she sent

26  the binder "with an itemized inventory of stolen property for approximately

27  $13,056,220.01."  (Dkt. No.123-15, Daza-Luu Decl., Ex. 22 at 20.)

28       On June 11, 2011, Farley denied Plaintiff's request for an advance payment.

[11cv2389-GPC(WVG)]

(Dkt. No. 123-3, D's RJN, Ex. 2 at 28.)  On June 14, 2011, York responded to Farley's letter of June 11, 2011.  (Dkt. No. 124-5, Brown Decl., Ex. 12 at 18.)  In that email, York stated that she did not have all available documents when she submitted the prior worksheets and it was not until about two weeks ago, after reviewing thousands of documents that she was able to submit "all of the inventory in the format you requested detailing each item."  (Id.)

On July 12, 2011, York appeared at the fourth EUO session.  (Dkt. No. 123-13, Daza-Luu Decl., Ex. 14, York Depo. at 150:7-9.)  At the fourth EUO session, York testified that the June 2, 2011 inventory was her insurance claim document seeking reimbursement for each item listed in the document as items stolen by Dr. Goldman or his associates on or before September 2009.   (Dkt. No. 123-14, Daza-Luu Decl., Ex 19, EUO Vol. 4 at 372:14-374:3.)  At the end of the day, the parties agreed to continue the EUO to July 18, 2011 but with reservations by Mr. Fitzgerald stating that he was not happy they were not finished and that many questions were asked that did not seem relevant to the claim and all the while York has been forced to file bankruptcy to avoid foreclosure.  (Dkt. No.123-14, Daza-Luu Decl., Ex. 19, EUO Vol. 4 at 602:3-24.)

On July 20, 2011, Farley denied Plaintiff's request for an advance and asked that the parties complete the EUO.  (UF 76.)  Due to scheduling conflicts, the parties rescheduled the fifth EUO session from July 18, 2011 to August 4, 2011.  (Dkt. No. 123-3, D's RJN, Farley Decl., Ex. 40 at 70; Dkt. No. 123-7, Turner Decl., Ex. 7 at 13.)

On August 3, 2011, Todd Macaluso advised Turner that he now represents Fay and York and cancelled the EUO session scheduled for the following day.  (UF 78.)  On August 16, 2011, Macaluso wrote to Turner confirming he represented both Plaintiffs.  (UF 81.)  On August 31, 2011, Turner asked about resuming the EUO and Macaluso responded stating that he filed a bad faith lawsuit against Travelers.[5]  (UF 83.)  On October 11, 2011, Turner advised Macaluso that Traveler's investigation of

---

[5]On August 26, 2011, Plaintiffs filed the instant complaint in state court.  (Dkt. No.1.)

[11cv2389-GPC(WVG)]

the claim was incomplete and asked whether Plaintiff would submit to another EUO. (Dkt. No. 123-13, Daza-Luu Decl., Ex. 14 at 49-50.)  In response, Macaluso asked Travelers for "a line by line itemization of each item of damage and an agreed to pay or not agreed to pay because of x, y, z." (Dkt. No. 123-13, Daza-Luu Decl., Ex. 14 at 49.)  Travelers indicated that it is not in a position to provide a line by line itemization because Plaintiff has prevented Travelers from completing its investigation. (Dkt. No. 123-13, Daza-Luu Decl., Ex. 14 at 48.)  Unhappy with Travelers' response, Macaluso stated they would proceed with litigation. (Dkt. No. 123-13, Daza-Luu Decl., Ex. 14 at 48.)

On December 20, 2001, Travelers denied Plaintiff's Claim based on Plaintiff's failure to cooperate, failure to complete the EUO, material misrepresentation, and fraud. (Dkt. No.  123-3, D's RJN, Ex. 3, Turner Decl., Ex. 43 at 81.)

On July 9, and 10, 2014, York changed her statements and testified that the June 2, 2011 inventory was not a list of items that had been stolen by Dr. Goldman but was a list of all tangible items at the building at the time of loss. (Dkt. No. 123-11, Daza-Luu Decl., Ex. 13, LJS Depo. at 272:8-273;1; Dkt. No. 123-13, Daza-Luu Decl., Ex. 14, York Depo. at 34:2-17.)  In 2014, she testified that the June 2, 2011 inventory contained millions of dollars worth of items left behind by Dr. Goldman and/or were awarded to Dr. Goldman and rightfully removed.  (UF 98, 99.)  In addition, York testified that Dr. Goldman did not steal the claimed Vitaphenol and the Obagi products. (UF 100, 101.)  At the 2014 deposition, tt was also revealed that the bulk of the tangible items identified on the original March 29, 2010 inventory were copied from a list of items that Dr. Peter Mann moved into the operating room of the second floor after Dr. Goldman left.  (UF 103.)

During the fourth EUO, Travelers learned for the first time that Fay leased a portion of the Fay Avenue property to Dr. Peter Mann in an effort to restore business operations after Dr. Goldman left. (Dkt. No. 123-3, D's RJN, Ex. E, Denial Ltr. at 100.)  York denied any financial arrangement with Dr. Mann and stated that in

exchange for the use of his lasers, she did not charge rent.  She also stated there was no lease agreement.  (Dkt. No. 123-3, D's RJN, Ex. E, Denial Ltr. at 100.)  Then, during investigation of the claim, Travelers discovered that in December 2009, Fay entered into a written lease agreement with Dr. Peter Mann ("Dr. Mann") for the Fay Avenue property that had a commencement date in November 2009. (UF 102; Dkt. No. 123-13, Daza-Luu Decl., Ex. 14 at 57.)

### A.     Legal Standard for Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action. " Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact.  Celotex Corp., 477 U.S. at 323.  The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial.  Id. at 322-23.  If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for

[11cv2389-GPC(WVG)]

trial.'" <u>Celotex</u>, 477 U.S. at 324.  If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. <u>Id.</u> at 325.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." <u>Fontana v. Haskin</u>, 262 F.3d 871, 876 (9th Cir. 2001).  The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. <u>Anderson</u>, 477 U.S. at 255.

Defendant specifically moves for summary judgment on the breach of contract cause of action as well as the cause of action for breach of the implied covenant of good faith and fair dealing and the punitive damages award.  While it appears that Defendant moves for summary judgment on all the causes of action, it fails to present argument on the fraudulent concealment and negligence causes of action.  Accordingly, the Court declines to consider those causes of action on the instant motion for summary judgment.

**B.    Breach of Contract**

Plaintiff's cause of action for breach of contract alleges that Travelers failed to pay amounts due under the insurance policy.  In its motion for summary judgment, Defendant argues that the insurance policy coverage was precluded when Plaintiff failed to complete the EUO and because Plaintiff made material misrepresentations during the claim process in violation of its "concealment, misrepresentation and fraud" provision.  In opposition, Plaintiff argues that there is a genuine issue of material fact whether Plaintiff failed to complete the EUO and whether Plaintiff materially misrepresented facts.

**1.    Failure to Complete the EUO**

"An insured's compliance with a policy requirement to submit to an examination

[11cv2389-GPC(WVG)]

under oath is a prerequisite to the right to receive benefits under the policy." <u>Brizuela</u> <u>v. Calfarm Ins. Co.</u>, 116 Cal. App. 4th 578, 587 (2004).  "[A]n insured materially breaches an insurance policy by failing to submit to an examination under oath, as often as may reasonably be required, or failing to answer material questions." <u>Abdelhamid v. Fire Ins. Exchange</u>, 182 Cal. App. 4th 990, 1001 (2010) (quoting 13 Couch on Insurance (3d ed. 1999) 106:24 at 197-32).  In <u>Abdelhamid</u>, the court explained that the California legislature has acknowledged that information may be necessary to the insurer's investigation of the claim and where failure prevents the insurer from being able to determine the validity of the claim or extent of loss, the insured's rights may be affected and the "Legislature has placed that risk on the insured." <u>Id.</u> at 1004.

"Generally, in the absence of a reasonable excuse, when an insured fails to comply with the insurance policy provisions requiring an examination under oath and the production of documents, the breach generally results in a forfeiture of coverage, thereby relieving the insurer of its liability to pay, and provides the insurer an absolute defense to an action on the policy." <u>Brizuela</u>, 116 Cal. App. 4th at 670.

In <u>Sarkisyants v. State Farm Mutual Auto. Ins. Co.</u>, 256 Fed. Appx. 52, 53 (9th Cir. 2007), the Ninth Circuit upheld summary judgment in favor of the insurer because the insured "did not attend a reasonably requested second examination under oath, despite numerous requests." <u>Id.</u>  This included numerous requests and nine reminder letters in nine months. <u>Id.</u>  In another case, the court granted summary judgment to the insurer because the insured refused to attend and complete his EUO. <u>Chan v. Empire</u> <u>Fire & Marine Ins. Co.</u>, No. C 10-2528 EJD, 2011 WL 3267765, at *6 (N.D. Cal. 2011).  In that case, the plaintiff attended an EUO but was uncooperative and refused to answer questions and said he would not return after lunch. <u>Id.</u> at *2.  The defendant then made numerous attempts to seek additional dates to continue the EUO which did not occur until many months later. <u>Id.</u>  At the subsequent EUO, the insured obstructed the examination. <u>Id.</u> at 3.  He was reluctant to answer questions and the session was

adjourned early so that information could be provided to the defendant.  Defendant continued its efforts to obtain the necessary information or an EUO but without any response from the plaintiff.  Id. at 3-4.  The Court held that the plaintiff could not maintain a cause of action for breach of contract.  Id. at 6.

Here, it is undisputed that the insurance policy, in this case, imposed certain requirements which included a duty to submit to an examination under oath and a duty to "cooperate."  The insurance policy provides:

> **E.     PROPERTY LOSS CONDITIONS**
> . . . .
> **3.     Duties in the Event of Loss or Damage**
>
> a.     You must see that the following are done In (sic) the event of loss or damage to Covered Property: …
>
> (2)     Give us prompt notice of the loss or damage. Include a description of the property involved.
>
> (3)     As soon as possible, give us a description of how, when and where the loss or damage occurred.
> . . .
> (5)     At our request, give us complete inventories of the damaged and undamaged property.  Include quantities, costs, values and amount of loss claimed.
>
> (6)     As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.
> . . .
> (9)     Cooperate with us in the investigation or settlement of the claim.
> . . .
> b.     We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records.

(Dkt. No. 123-17, Daza-Luu Decl., Ex. 25 at 44-45.)

Defendant argues it was reasonable to request a fifth EUO session because between the third and fourth EUOs, the insurance claim grew from about 230 line items

valued at about $2.8 million to over 1,000 line items valued at over $13 million. At the end of the fourth EUO, both parties agreed to schedule another session. However, on August 3, 2011, Plaintiff retained new counsel, Todd Macaluso, who canceled the EUO scheduled for the next day. Despite follow up requests to conduct an EUO, Macaluso rejected these efforts.

In opposition, Plaintiff argues that the EUO condition in the insurance policy allowed only one EUO, not multiple ones; therefore, it was not required to appear at the fifth EUO. The Court disagrees. The language in the policy "at such times as may be reasonably required" contemplates more than one EUO. Moreover, California law also recognizes that there can be more than one EUO. See Abdelhamid, 182 Cal. App. 4th at 1001 .

Plaintiff then argues that even if multiple EUOs were allowed, as long as there is substantial compliance with an EUO provision, Defendant's argument fails. Plaintiff states that it did not fail to submit to EUOs and did not refuse to answers questions. Plaintiff substantially complied when it answered questions, provided documents and submitted to four EUOs.

Plaintiff cites to Florida cases to support the "substantial compliance" standard. However, in California, the standard is not "substantial compliance" but whether it was reasonable for Plaintiff to refuse to attend an EUO. See Abdelhamid, 182 Cal. App. 4th at 1002 (citing Couch on Insurance and stating "[w]here compliance with an insurer's request for examination under oath is a condition precedent to recovery, the insured's failure to comply, in the absence of a reasonable excuse, breaches the policy and forfeits his or her right to recovery under the policy, and is a defense to an action on the policy.").

Next, in applying the reasonableness standard, Plaintiff argues it was unreasonable for Defendant to require York to submit to five EUOs because there was only one issue to resolve: the ownership of the items at the property and it should not take five or more EUOs to answer that question.

1 Plaintiff argues that Travelers could have determined the scope and pricing of

2 items through other means.  For example, Plaintiff contends that the insurance policy

3 included a $10,000 claim data benefit for insureds to have their own professional

4 perform the task.  (Dkt. No. 128-14, P's Exs., Ex. 17, Farley Depo. at 68:16-69:4.)

5 However, this benefit was never relayed to Plaintiff which also violated 10 Cal. Code.

6 Reg. section 2695.4.[6]

7 According to policy, the $10,000 claim data expense provides that Travelers will

8 "pay the reasonable expenses you incur in preparing claim data when we require such

9 data to show the extent of loss.  This includes the cost of taking inventories, making

10 appraisals, preparing income statements, and preparing other documentation."  (Dkt

11 .No. 123-17, Daza-Luu Decl., Ex. 25, at 22, 70.)  Travelers never informed York about

12 the claim data benefit as well as other coverages under the policy.  (Dkt. No.1 28-14,

13 P's Exs., Ex. 17, Farley Depo. at 81:18-83:20.)  Therefore, a question of fact arises as

14 to whether the claim data processing could have been expedited if Plaintiff had been

15 informed of the $10,000 claim data expense which could have eliminated the need for

16 multiple EUOs.

17 Plaintiff also contends that while the final claim spreadsheet increased the claim

18 to over $13 million, Travelers and York knew the business personal property limit was

19 only $2.1 million and there was no need for Travelers to request information that went

20 beyond such pricing.  A question of fact arises as to whether Travelers had enough

21 information early on to render unnecessary the last EUO.

22 Lastly, Plaintiff argues that Travelers' pre-determined the result and used the

23 EUO process to set up a fraud denial based on Dr. Goldman's attorney's representation.

---

[6] 10 Cal. Code. Reg. section 2695.4 states, "[e]very insurer shall disclose to a first party claimant or beneficiary, all benefits, coverage, time limits or other provisions of any insurance policy issued by that insurer that may apply to the claim presented by the claimant. When additional benefits might reasonably be payable under an insured's policy upon receipt of additional proofs of claim, the insurer shall immediately communicate this fact to the insured and cooperate with and assist the insured in determining the extent of the insurer's additional liability."  10 Cal. Code. Reg. § 2695.4

On March 23, 2010, an email was sent from Travelers' Prosecution Coordinator to Farley regarding investigation of the claim for possible prosecution consideration. (Dkt. No. 128-20, LJS Exs., Ex. 17 at 55.)  In the email, the Prosecution Coordinator wrote, "[t]he suspected fraud is that the claimant has filed a claim for items ordered turned over through a court order." (Id.)  This also raises a question of fact whether Travelers was predisposed to viewing York's Claim as a fraudulent one.

The Court concludes that there are genuine issues of material fact whether it was reasonable for Plaintiff to refuse to attend the fifth EUO to determine the scope and pricing of items taken by Dr. Goldman.[7]

### 2.    Concealment, Misrepresentation and Fraud Provision

Defendant argues that the concealment, misrepresentation and fraud provision precludes coverage because Plaintiff made numerous material misrepresentations as to the contents of the claim inventory.  In fact, based on these misrepresentations, Defendant has never received a complete inventory of stolen or damaged items.  Plaintiffs argues that there are genuine issues of material fact as to whether the statements were false and whether York knew them to be false at the time she made them.

In California, an insurer may defend against a breach of contract claim by showing that the insurance policy is void under a fraud or concealment clause.  See Cummings v. Fire Ins. Exchange, 202 Cal. App. 3d 1407, 1416-17 (1988); see also Leasure v. MSI Ins. Co., 65 Cal. App. 4th 244, 248 (1998).  A fraud or concealment clause voids a policy if a material misrepresentation is "knowingly and willfully made, with intent to deceive the insurer." Cummings, 202 Cal. App. 3d at 1416 (quoting

---

[7]Plaintiff also argues that it offered to submit to further EUOs in August 2013, after LJS's current counsel was substituted in the case, but Travelers refused.  Plaintiff has not shown that an offer to submit to further EUOs, two years after a lawsuit has been filed and almost two years after a denial of the claim is sufficient to demonstrate compliance with the EUO condition in the policy.  In fact, such an offer does not constitute compliance with an EUO condition.  See Cook v. Allstate Ins. Co., 337 F. Supp. 2d 1206, 1215-16 (C.D. Cal. 2004) (holding that offer for EUO after lawsuit has been filed was legally insufficient).

1  Claflin v. Commonwealth Ins. Co., 110 U.S. 81, 95 (1884)).

2      An insurer must prove the following elements to demonstrate fraud or

3  concealment sufficient to void an insurance policy: 1) Plaintiff made a false statement;

4  2) Plaintiff knew the statement was false when made; 3) the statement was material;

5  and 4) Plaintiff intended to deceive Defendant.  See id. at 1416-17.  In general, the

6  "issue of whether the insured's false statement was knowingly and intentionally made

7  with knowledge of its falsity and with intent of defrauding the insurer is a question of

8  fact." Id. at 1418.  However, the court also held that "if the matter were material and

9  the statement false, to the knowledge of the party making it, and willfully made, the

10  intention to deceive the insurer would be necessarily implied, for the law presumes

11  every man to intend the natural consequences of his acts." Id. at 1416.  In Cummings,

12  the plaintiff knew she was lying to the defendant and did so with the intent that

13  defendant not find out the facts.  Id. at 1417-18.

14      In Claflin, the United States Supreme Court held that the "intent to defraud the

15  insurer is necessarily implied when the misrepresentation is material and the insured

16  wilfully makes it with knowledge of its falsity." Claflin v. Commonwealth Ins. Co.,

17  110 U.S. 81, 84-86, 94-97 (1884) (predecessor assignee to the insurance policy

18  provided false information relating to the consideration he paid his assignor for the

19  goods but he did not to deceive the insurer but knowingly made a statement consistent

20  with the one he had previously made to a commercial agency in hopes of securing

21  commercial credit).  Therefore, it is well established that the untrue statement, in order

22  to avoid the policy, must have been knowingly and intentionally made by the insured

23  with knowledge of its falsity and with the intention of defrauding the company.  See

24  Clark v. Phoenix Ins. Co., 36 Cal. 168, 174 (1868); West Coast Lumber Co. v. State

25  Inv. & Ins. Co., 98 Cal. 502, 504 (1893) (citing Claflin, 110 U.S. at 81.)

26      A mere discrepancy does not create a presumption as a matter of law that the

27  insured contemplated fraud when his statements were made.  Miller v. Fireman's Fund

28  Ins. Co. of San Francisco, 6 Cal. App. 395 398-99 (1907).  In Miller, the Court held

1  that a mere discrepancy or innocent error in an excessive statement, not intentionally

2  false or fraudulent, will not vitiate the policy.  Id.

3    In this case, the insurance policy's concealment, misrepresentation or fraud

4  provision states the following:

5    California Changes endorsement (Form No. IL 01 04 09 07)

6    C.    The Concealment, Misrepresentation Or Fraud Condition is
         replaced by the following with respect to loss ("loss") or damage
7         caused by a Covered Cause of Loss other than fire: This
         Coverage Part is void if any insured ("insured"), whether before
8         or after a loss ("loss"), has committed fraud or intentionally
         concealed or misrepresented any material fact or circumstance
9         concerning:

10        1. This Coverage Part;
         2. The Covered Property;
11        3. An insured's ("insured's") interest in the Covered Property;
      or
12        4. A claim under this Coverage Part or Coverage Form.
   [UF 95.]
13

14    York does not deny the fact that conflicting or false statements were made during

15  the claims process but states that she was "mistaken or confused" due to her

16  inexperience with the claims process.  (Dkt. No. 128-6, York Decl. ¶ 27.)

17    As to the March 29, 2010 inventory, Defendant states that Plaintiff represented

18  that the list contained items being claimed as damaged or stolen.  However, it was later

19  learned at York's depositions on July 9, and 10, 2014, that the March 29, 2010

20  inventory contained many items that Dr. Mann brought into the operating room when

21  Dr. Goldman moved out.  In response, Plaintiff asserts that she did not prepare the

22  document but it was prepared by Wise, her assistant and York testified at the EUO that

23  she did not know if the list was complete.  Therefore, the issue of whether York knew

24  the contents of the March 29, 2010 inventory were not a list of damaged or stolen items

25  is disputed.

26    As to the June 2, 2011 inventory which was initially alleged to be a complete list

27  of all items taken by Dr. Goldman, Plaintiff now alleges that the June 2, 2011 inventory

28  was a list of all tangible items that were at the Fay Avenue property at the time of loss.

   According to York, she understood the post-April 22, 2011 inventories to be "all

personal property in the LJ Spa Building at the time of the September 18, 2009 theft" based on comments made by Turner after the conclusion of her third EUO on April 22, 2011. (Id. ¶¶ 27, 28.)  She stated that the June 2, 2001 inventory contained items exceeding $10 million  and she knew her coverage was limited to $2.1 million. (Id. ¶ 31.) Tobi Blatt also states that York told her that Turner "wanted a complete inventory of the building, including the providing and replacement cost of the items listed." (Dkt. No. 128-3, Blatt Decl. ¶ 2.)  Then it was not until her deposition in July 2014, that York realized the mistake.

On the June 2, 2011 inventory, Defendant also asserts that York lied because the inventory was originally a list of items stolen by Dr. Goldman, including the Vitaphenol and Obagi products, but then in July 2014, she stated that Dr. Goldman did not steal those products.  As to the Vitaphenol product line, York testified at her fourth EUO, on July 12, 2011, that it was sold by the court appointed receiver before the theft by Dr. Goldman.  (Dkt. No. 128-11, LJS Exs., Ex. 13, EUO Vol. 4 at 490:19-491:8.) As for the Obagi product, the divorce judgment, which was provided to Travelers on March 2, 2010, specifically states that Dr. Goldman was awarded all rights in the Obagi product line.  Therefore, Travelers was aware that the Vitaphenol and Obagi products were not items taken by Dr. Goldman.  These facts raise genuine issues of material fact whether York knew her statements as to the June 2, 2011 inventory were false.

Moreover, Defendant points out that during the claims process, York denied that any written agreement existed with Dr. Mann; however Travelers later discovered there was an executed lease agreement.  Defendant argues that Plaintiff's claim for lost business income would be affected by any amounts received from Dr. Mann and Plaintiff's alleged failure to disclose the existence of a written lease with Dr. Mann is material to the claim of loss of income.  In opposition, Plaintiff presents the deposition of Dr. Mann where he states that he was not renting and did not pay any rent to York. (Dkt. No. 128-21, LJS Exs., Ex. 22, Mann Depo. at 45:21-25; 285:2-6; 18-24.)  He stated that he signed a lease agreement because York needed it for the bank to show

[11cv2389-GPC(WVG)]

1    she was generating income. (Id. at 284:15-23.)  In exchange, he brought in lasers. (Id.
2    at 324:14-325:8.)

3         The Court notes that the alleged denial of a written lease agreement with Dr.
4    Mann during the fourth EUO would be a material false misrepresentation that Plaintiff
5    knew was false at the time it was made.  However, Defendant does not provide
6    sufficient evidentiary support for its allegation.  Defendant merely cites to its denial
7    letter to support the allegation that York denied the existence of a written agreement
8    with Dr. Mann.  (Dkt. No. 123-3, D's RJN, Ex. 3 at 99.)  The denial letter provides
9    excerpts from the fourth EUO transcript; however, Defendant fails to provide the full
10   pages of relevant portions of fourth EUO transcript concerning this issue as an exhibit
11   in its motion for summary judgment.  The quoted excerpt in the denial letter does not
12   provide a clear indication that York denied the existence of a written lease agreement.[8]
13   Moreover, the many ellipses, indicating omitted words or sentences, also confirm that
14   the Court was not provided with a full record on this issue.  Therefore, the Court cannot
15   conclude that there are no genuine issues of material fact as to whether Plaintiff
16   knowingly made false representations as to the lease agreement with Dr. Mann.

17        While the Court has concerns as to the numerous false statements made by York

---

18

19        [8]The denial letter includes the following excerpt from the fourth EUO transcript.

20        Q.   Was Dr. Mann someone that you leased space to at the facility?
21        A.   Correct.
                        ***
22        Q.   What was the nature of the agreement?
          A.   We had no agreement.
                        ***
23        Q.    You did not charge him for use of the facility?
          A.   No. I borrowed his laser.
24        Q.   In exchange for letting him use the medical facility, he brought a laser
               into the building.?
25        A.   Correct.
                        ***
26        Q.   No percentage or other type of fee arrangement?
          A.   No.
27
          (York EUO, Vol. IV, 478:4-25, 480:12-18, 482:4-6.)
28
     (Dkt. No. 123-3, D's RJN, Ex. 3 at 99.)

[11cv2389-GPC(WVG)]

and whether they were in fact due to a mistake or confusion, the Court, on summary judgment, must  view the facts in light most favorable to the non-moving party.  See Fontana, 262 F.3d at 876.  In doing so, the Court concludes that there are genuine issues of material fact as to whether York knew she was making false statements at the time they were made.  Accordingly, the Court DENIES Defendant's motion for summary judgment on the breach of contract cause of action.

**C.      Breach of the Implied Covenant of Good Faith and Fair Dealing**

Defendant moves for summary judgment on the claim for breach of the implied covenant of good faith and fair dealing.  Plaintiff opposes.

An insurer may be liable for breach of the implied covenant of good faith and fair dealing when it withholds policy benefits unreasonably or without proper cause. California Shoppers, Inc. v. Royal Globe Ins. Co., 175 Cal. App. 3d 1, 52 (1985). Based on the discussion and the Court's ruling on the breach of contract claim, the issue in this case is whether the insurer unreasonably withheld policy benefits. Accordingly, the Court DENIES Defendant's motion for summary judgment on the claim for the breach of the implied covenant of good faith and fair dealing.

**D.      Punitive Damages**

Defendant moves for summary judgment on the request for punitive damages. Plaintiff asserts that there is a genuine issue of material fact whether Defendant acted with malice and oppression by abusing the EUO process.

To recover punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant is guilty of "oppression, fraud, or malice."  Cal. Civ. Code 3294(a).  Based on the Court's ruling above, the Court DENIES Defendant's motion for summary judgment on punitive damages.

**E.      Evidentiary Objections**

Plaintiff filed evidentiary objections to Travelers' evidence in support of its motion for summary judgment.  (Dkt. No. 128-22.) Travelers also filed evidentiary objections to Plaintiff's evidence in opposition to the motion for summary judgment.

(Dkt. No. 133-2.)  The Court notes the objections.  To the extent that the evidence is proper under the Federal Rules of Evidence, the Court considered the evidence.  To the extent that the evidence is not proper, the Court did not consider it.

**F.      Plaintiff's *Ex Parte* Motion for Leave to File Sur Reply**

On September 11, 2014, Plaintiff filed an *ex parte* motion for leave to file supplemental declaration of Patrick Howe.  (Dkt. No. 135.)  Defendant filed an objection on September 12, 2014.  (Dkt. No. 136.)  In essence, Plaintiff is seeking to file a sur reply.  Because the Court did not consider Dr. Kincaid's declaration in ruling on the motion for summary judgment, the Court DENIES Plaintiff's *ex parte* motion for leave to file a sur reply as MOOT.

<strong>Conclusion</strong>

Based on the above, the Court DENIES Defendant's motion for summary judgment.  The Court also DENIES Plaintiff's *ex parte* motion for leave to file a sur reply.  The hearing date set for September 26, 2014 shall be **vacated.**

IT IS SO ORDERED.


DATED:  September 23, 2014

HON. GONZALO P. CURIEL
United States District Judge